# THE PEOPLE OF THE STATE OF NEW YORK ex rel. WILLIAM McDONALD, Appellant, v. WILLIAM H KEELER, as Sheriff of Albany County, Respondent.

*Senate of the State of New York—power of, to conduct an investigation as to the management of departments in the city of New York — when it may compel a witness to appear and testify — power of, to punish for contempt — it cannot exercise judicial functions — right of a witness appearing before one of its committees to have the advice of counsel.*

January 14, 1884, the senate of the State of New York passed a resolution reciting that grave charges of fraud and irregularities had been made from time to time by the public press and the Union League club, of the city of New York, against one Thompson, the commissioner of public works of the said city; that the charges had, in the opinion of many persons, never been satisfactorily explained and fairly refuted; and that it was of vital importance to all the taxpayers of the State that the heads of all public departments should be beyond reproach, and directed that the standing committee on the affairs of cities of the senate be directed and empowered to investigate the Department of Public Works of the said city, " with power to send for persons and papers," and to report " the result of such investigation and its recommendation concerning the same to the senate " on or before a day named.

One McDonald, who was examined before the committee as a witness, refused to answer certain questions put to him, relating to the manner in which he kept his books and carried on his business, and as to the sources from which, and the persons from whom he procured material sold by him to the city.    Subsequently, McDonald left the committee and refused to answer further questions.    Upon the report of the committee to the senate, a resolution was adopted declaring McDonald to be in contempt, for refusing to answer the questions.    Thereafter, another resolution was adopted, which, after reciting that McDonald had been declared "to be guilty of a contempt of the senate," and had been "convicted thereof for refusing to answer " questions put to him by the committee, and for refusing to submit to an examination, and quitting the presence of the committee, remanded him into the custody of the sergeant-at-arms, and sentenced him to be by said sergeant imprisoned in the county jail of Albany county, there to remain until he should consent to appear before the committee and answer the questions to be put to him; said imprisonment, however, not to extend beyond the final adjournment of the then present legislature.    Upon a warrant issued by the president of the senate, McDonald was confined in the Albany county jail.

Upon an appeal from an order denying an application for his discharge upon a writ of *habeas corpus :*

*Held,* that the questions put to the witness were immaterial, and that he was not bound to answer them.

That, except when engaged in the judicial functions authorized by the constitution, neither branch of the legislature has any power to punish, as for contempt, for a refusal to answer a question.

That in investigating the department of public works in the city of New York, the senate was not exercising any of the judicial functions conferred upon it by the constitution, and could not punish a witness as for contempt in refusing to answer questions put to him by its committee.

That the order refusing to discharge McDonald should be reversed, and that he should be discharged.

Upon the hearing before the committee the counsel of the witness was allowed to appear "as a matter of courtesy," but upon his advising the witness not to answer certain questions, the committee refused any longer to recognize the right of the witness to have counsel, and thereupon the witness withdrew:

*Held,* that the witness had a right to have the advice of counsel, in an orderly manner, and that, when this was refused, he was justified in withdrawing.

Even if it be granted that there are cases in which the senate might imprison a witness for a refusal to answer (as, for instance, in the trial of charges against judicial officers), yet the senate is not the sole judge of the proper exercise of its powers, and its decision thereon is subject to review and examination by the courts. (Per LEARNED, P. J.)

APPEAL from an order made at a Special Term dismissing proceedings for the discharge of the relator upon the return to a writ of *habeas corpus,* and remanding the relator to the custody of the sheriff of the county of Albany.

On the 14th day of January, 1884, the senate of the State of New York passed the following resolution:

*Whereas,* Grave charges of fraud and irregularities have been made from time to time by the public press, and recently by the Union League Club of the city of New York, against Hubert O. Thompson, commissioner of public works in the city of New York; and

*Whereas,* These charges have, in the opinion of many persons, never been satisfactorily explained or fairly refuted; and

*Whereas,* It is of vital importance to all the taxpayers of this State that the heads of all public departments should be beyond reproach; therefore, be it

*Resolved,* That the standing committee on the affairs of cities of this senate be, and it hereby is, directed and empowered to investigate the department of public works in the city of New York, with power to send for persons and papers; and said committee is hereby authorized to employ a stenographer and such counsel and account-

ants as it may deem necessary for the thorough discharge of the duties hereby imposed. Such committee to report the result of such investigation, and its recommendations concerning the same, to the senate on or before the fifteenth day of April next.

That thereafter the said committee on the affairs of cities of said senate held several sessions, or meetings, in the city of New York.

The appellant William McDonald had been summoned as a witness before the senate committee, and after a lengthy examination had refused to answer questions as to where he had obtained and what he had paid for certain materials furnished to such department, and other questions touching his business as a dealer in coal, and had left the presence of such committee after having been deprived of the assistance and advice of counsel, and declined to be further examined. Upon the report of the committee the senate adopted the following resolution :

"*Resolved*, That William McDonald is declared to be in contempt of the senate for refusing to answer as a witness pertinent questions propounded by the standing committee on cities in the investigation of the department of public works of the city of New York, and for quitting the presence of the committee pending his examination as a witness."

The said William McDonald was then again brought before the bar of the senate and was asked by the president if he was willing to appear before the senate committee on cities and answer the questions which he had refused to answer. The said William McDonald having failed to make satisfactory answer to the interrogatory of the president, and to purge himself of the contempt of which he had been adjudged guilty, the senate adopted the following resolution :

"*Resolved*, That William McDonald having been declared to be guilty of a contempt of the senate, and being convicted thereof for refusing to answer as a witness pertinent questions propounded by the standing committee on the affairs of cities of the senate, in the investigation of the department of public works of the city of New York, and being summoned as a witness and appearing before the committee, for refusing to submit to an examination as a witness before said committee upon the subject of said investigation, and quitting the presence of said committee, be and he hereby is

remanded into the custody of the sergeant-at-arms, and is hereby sentenced to be by said sergeant imprisoned in the county jail of Albany county, there to remain until he shall consent to appear before the standing committee on the affairs of cities as a witness, and answer the questions put to him by the said committee in the matter of said investigation; said imprisonment, however, not to extend beyond the final adjournment of the present legislature. And the keeper of the said common jail of the county of Albany is hereby commanded to receive said William McDonald, and him safely keep and imprison in said jail until the final adjournment of the present legislature, unless sooner discharged by order of the senate."

Thereafter McDonald was taken into the custody of the sergeant-at-arms and the sheriff, under an instrument in the nature of a warrant signed by the president of the senate and attested by its clerk, and was confined thereunder in the Albany county jail.

An application for his discharge from such imprisonment by *habeas corpus*, argued at the Albany Oyer and Terminer, was denied. From such denial and the order entered thereon this appeal is taken.*

---

\* The following is a copy of the opinion delivered by WESTBROOK, J., upon denying the application:

### ALBANY OYER AND TERMINER.

#### IN THE MATTER OF WILLIAM McDONALD.

The senate of the State of New York directed its standing committee on cities to investigate the department of public works in the city of New York, and ascertain whether or not certain "grave charges of fraud and irregularities" made by the "public press" and by the "Union League Club of the city of New York," against Hubert O. Thompson, the head of such department, were true; such committee was empowered to "send for persons and papers," and was directed "to report the result of such investigation, and its recommendations concerning the same to the senate on or before the 5th day of April, 1884." The senate had no *judicial* control of the officer whose conduct was to be investigated, but could initiate *legislation* to prevent abuses in such department, and to remove its head. One William McDonald had been summoned as a witness before the senate committee, and had refused to answer questions concerning materials furnished to such department, and other questions touching his business as a dealer in coal, and had left the presence of such committee, and declined to be further examined. For such conduct McDonald

Learned, P. J.:

An idea has undoubtedly prevailed, and has had some judicial sanction, that congress and the legislatures of the states succeeded to all, or nearly all, those powers which were known under the general name of privileges of parliament, and which are stated in general language by Blackstone (1 Bl. Comm., 163, *et seq.*)  It was in accordance with this idea that, in 1870, the assembly of this State summoned before itself a justice of the Supreme Court to answer

. had been adjudged by the senate to be in contempt, and had been sentenced to imprisonment in the common jail of Albany county, "until the final adjournment of the present legislature, unless sooner discharged by order of the senate."  On an application for his discharge from such imprisonment by *habeas corpus*, returnable at the Albany Oyer and Terminer, then in session, it was

*Held, first.* The resolution of the senate should be construed as authorizing an inquiry for the purpose of *legislation*, and not simply as one to determine the truth of charges made against an official, over whom it had no *judicial* control.

*Second.* The power to punish for a contempt is a *judicial* and not a *legislative* one. (This proposition discussed on principle, and *Kilbourn* v. *Thompson*, 103 U. S., 168, 193; *Kielley* v. *Carson*, 4 Moore's P. C., 62, 89, 90; *Fenton* v. *Hampton*, 11 id., 347, 352, etc.; and *Doyle* v. *Falconer*, L. R., 1 P. C., 328, cited as establishing it.)

*Third.* The provisions of the Revised Statutes (1 R. S. [Edm. ed.], 153, § 13, sub. 4), so far as they authorize the punishment by the legislature, or either house thereof, of an alleged contempt incurred in the prosecution of a purely *legislative* inquiry, and not in one in which it has *judicial* functions to discharge (there are judicial duties devolved upon the legislature and each house thereof by the constitution of the State), are *believed* to be unconstitutional for two reasons, to wit: 1st. The lodgment of judicial power in a different department is a prohibition against the transfer by the legislature to itself of any such power.  2d. As violating article 1, section 6 of the Constitution of the State, declaring, "No person shall be  *  *  *  deprived of life, *liberty* or property without due process of law."  (Citing *Kilbourn* v. *Thompson*, 103 U. S., 168, 182; *Taylor* v. *Porter*, 4 Hill, 140–147; *People* v. *Draper*, 15 N. Y., 532, 543, 544; and *Happy* v. *Mosher*, 48 id., 313.)

*Fourth.* The power to punish for an alleged contempt incurred in the course of an inquiry, made for the purpose of *legislation*, is not an *inherent* one in a legislative body.  The *dicta* to the contrary in elementary text books and judicial opinions, all rest upon *Anderson* v. *Dunn* (6 Wheaton, 204), *Burdett* v. *Abbott* (14 East, 1131), and some of the earlier English cases, all of which are overruled, the first in *Kilbourn* v. *Thompson* (103 U. S., 168), and the last in *Kielley* v. *Carson* (4 Moore's P. C., 62), *Fenton* v. *Hampton* (11 id., 347), and *Doyle* v *Falconer* (1 Law Rep., P. C., 328).

*Fifth.* The congress of the United States is a legislative body as well as a legis-

for a judicial act, done by him while sitting as one of the judges of the Court of Oyer and Terminer. Fortunately the assembly, in the end, contented itself with a harmless vote, to the effect that the justice had, without bad intention, committed a breach of privilege. (*In Matter of Platt Potter*, Potter's Dwarris on Stat., 573.) It is known that the power of the assembly would have been contested if any attempt had been made to punish the justice.

This idea of inherited privileges, and especially of inherited power

lature of the State. Whatever unconferred powers the latter has as ancillary to its right to legislate, must also be possessed by the former in aid of its legislation upon subjects within its jurisdiction. The case of *Kilbourn* v. *Thompson*, is therefore applicable to the present. (The alleged inherent power of a legislature to punish for a contempt committed in the progress of an inquiry purely *legislative*, considered on reason and authority. *Kilbourn* v. *Thompson* analyzed, and its effect upon the present case shown.)

*Sixth.* Neither branch of the State legislature, under section 17 of article 1 of our State Constitution, obtains the power to punish for contempt in aid of *legislation*, because: 1st. It was not a part of the "common law" of England, but of the *"Lex et Consuetudo Parliamenti,"* and as parliament asserted, and as was universally conceded, its "power being above the law is not founded upon the common law." 2d. No act of the legislature of the colony of New York ever conferred upon itself any such power. 3d. As the power of parliament was *omnipotent*, and the power to punish for contempt was never conferred upon the colonial or State legislature, it is a legal impossibility that either could succeed thereto as an *inheritance*, for both took only *conferred* power. (These propositions, discussed at considerable length, citing the cases before referred to, and also Bancroft's History of the U. S., vol. 2, p. 414; vol 3, pp. 56, 101; 2 R. L. of 1813, appendix, p. 6; 1 Black. Com., 160, 161, 163; *Landers* v. *Woodworth*, 2 Can. Sup. Ct. Reps., 158; 1 Hallam's Con. Hist., 224, 225.)

*Seventh.* If the provisions of the Revised Statutes before cited, and which are claimed to confer the power exercised, are unconstitutional, then they were not validated by article 1, section 17 of the Constitution, because only such statutes as were "*in force*" at the time of the adoption of the Constitution are covered by its language. In no proper sense can an unconstitutional law be said to be "*in force*." Neither can a long continued *claim* of power and its *occasional* exercise confer it if illegal. A citizen deprived of liberty can always question the existence of an authority which holds him in custody.

*Eighth.* The power of the State legislature, and of either house, to punish for a contempt committed during the progress of judicial inquiry which it is authorized to make (in determining the election, etc., of its own members, in investigations with reference to impeachments by the assembly, and in the various other cases specified in the Constitution) are undeniable, but the existence of any such power in aid of *pure legislation* is more than doubtful. While a single judge, holding without associates a court, entertains these views, both on

to punish as for contempt, is set forth very fully in *Wickelhausen v. Willett* (10 Abb. Pr., 168). It is made, also, a part of the argument for the respondent in this case (by counsel representing the senate) where he insists that the legislature has succeeded to the whole of the parliamentary law of England so far as it is not withheld by or repugnant to the Constitution, including the power to punish for contempt. It is urged by the counsel for the respondent that this power existed in the colonial legislatures, and has thus come down

reason and on a careful study of the recent utterances of the Supreme Court of the United States and of the Privy Council of England, he should still in judicial *action*, while freely discussing, as it is his duty to do, a question of such vast importance, to the end that it may by rightly settled, not rashly attempt to overturn and disregard the practice of the State for many years, the judicial *dicta* of its judges, and the opinions of elementary writers of acknowledged high authority, upon cases not necessarily controlling in this State. Especially should he not do so when its effect will be, if he is wrong in his views, to improperly arrest an important inquiry which a legislative body, largely composed of eminent lawyers, supposes it has the power to pursue; and to practically overrule a decision of the General Term of this department (*People* v. *Learned*, 5 Hun, 626), the court immediately above the one which he is holding. As McDonald will be entitled to full redress if his imprisonment be adjudged unlawful, he must be remanded to the custody of the sheriff of Albany county to be held by such sheriff under the senate's commitment, or until a higher court shall, with the additional light before it afforded by the recent decision of the Supreme Court of the United States reconsider its own conclusion, reached without any discussion by it, probably on the faith of *Anderson* v. *Dunn*, and the older English cases.

*Ninth.* Section 719 of the Penal Code does not apply. That section was intended to define with accuracy when the penalties for crime prescribed by such Code took effect, and such penalties relate only to those which are to be pronounced by courts on criminal prosecution instituted to punish crime. It does not interfere with any power elsewhere bestowed to punish summarily for contempt.

APPLICATION by McDonald to be discharged from imprisonment in the common jail of Albany county, in which he is confined by the sheriff of such county, under a commitment of the Senate of the State of New York, which recites a judgment of such body holding him to be in contempt for refusing, as a witness, to answer questions propounded by its standing committee upon cities and sentencing him to imprisonment therefor.

*T. C. E. Ecclesine* and *Hamilton Harris*, for McDonald.

*Henry Smith* and *N. C. Moak*, for the sheriff.

*F. W. Whittridge* and *B. F. Tracy*, for the Senate.

from them to the legislatures of the States. And the counsel cites instances of the exercise of this power by the colonial council and assembly of New York. It may therefore be worth while to examine this claim of power.

In the case of *Doyle* v. *Falconer* (L. R., 1 Privy Council, 328), the matter was examined. It was shown that the legislative assembly of an English colony does not possess the power of punishing a contempt, though committed in its presence and by one of its members; that such authority does not belong to a colonial house

WESTBROOK, *J.*—William McDonald, who is confined in the jail of Albany county, through and by the writ of *habeas corpus* asks his discharge from such imprisonment.

The writ was allowed by the Hon. WILLIAM L. LEARNED, one of the justices of the Supreme Court of this State, and was made returnable at the court of Oyer and terminer, then in session in the county of Albany, as the law required, (2 Edm. Stat., 784, § 27; *People ex rel. Phelps* v. *Fancher*, 2 Hun, 226, 236, 237.)

The petition and return show the cause and circumstances of the commitment of McDonald to be as follows:

On the 14th day of January, 1884, the Senate of the State of New York passed the following preamble and resolution:

"*Whereas*, Grave charges of fraud and irregularities have been made from time to time by the public press, and recently by the Union League Club of the city of New York, against Hubert O. Thompson, commissioner of public works in the city of New York; and

"*Whereas*, These charges have, in the opinion of many persons, never been satisfactorily explained and fairly refuted; and,

"*Whereas*, It is of vital importance to all the taxpayers of this State that the heads of all public departments should be beyond reproach; therefore be it

"*Resolved*, That the standing committee on the affairs of cities of this senate be and it hereby is directed and empowered to investigate the Department of Public Works in the city of New York, with power to send for persons and papers, and said committee is hereby authorized to employ a stenographer and such counsel and accountants as it may deem necessary for the thorough discharge of the duties hereby imposed. Such committee to report the result of such investigation and its recommendations concerning the same to the senate on or before the fifteenth day of April next."

During the month of February succeeding the date of the passage of the resolution just given, William McDonald, in obedience to its subpœna, appeared before the senate committee as a witness, and was examined at considerable length in regard to material — gravel, limstone, chips, etc.— which he had furnished to the city. The witness, through his counsel, who appeared, as the committee held, only by its courtesy and not by right, refused and declined to answer sundry questions designed to ascertain where he had obtained the materials furnished to the city by him, and also other questions concerning his busi-

of assembly by analogy to the *Lex et consuetudo parliamenti* which
is inherent in the two houses of parliament, or to a court of justice
which is a court of record ; a colonial assembly having no judicial
functions.   This same doctrine had been previously held in
*Kielley* v. *Carson* (4 Moore P. C. Cases, 62), and in *Fenton* v.
*Hampton* (11 id., 347).   These cases overruled that of *Beaumont*
v. *Barrett* (1 id., 59), in which it had been held (as it seems to be
here claimed by the respondent's counsel) that the power of punish-

ness as a dealer in coal.   The witness finally, by advice of counsel, retired from
the presence of the committee and refused to be further examined.

The senate committee reported the conduct of the witness to the senate, and
on the 27th day of February, 1884, in pursuance of its resolution and by force of
its warrant issued to its sergeant-at-arms, McDonald was brought before the sen-
ate to answer for his alleged contempt in refusing to answer the questions pro-
pounded by the committee, and in leaving the presence of the committee after a
refusal to submit to a further examination.   Upon his arraignment before the
senate McDonald was heard by counsel, and the result was the adoption of a
resolution by the senate on the 28th day of February, 1884, *adjudging* him to be in
contempt for refusing to answer the questions asked by its committee, and for
refusing to submit to a further examination by and before such committee, and
*sentencing* him to imprisonment in the Albany county jail until he should submit
himself to be examined by such committee, and in case of his refusal so to do,
the imprisonment to continue until the final adjournment of the legislature.
Under such resolution McDonald was remanded to the custody of the sergeant-
at-arms, who was directed to deliver him to the sheriff of Albany county, to be
confined by said sheriff in the common jail of such county " until the final
adjournment of the present legislature, unless sooner discharged by order of the
senate."

After the adoption of the resolution by the senate McDonald was again brought
to its bar, and was informed by the president of its sentence.   The senate then
issued its warrant under its seal, signed by its president and clerk, reciting the
proceedings had before it, and directing the imprisonment of McDonald in con-
formity with its sentence, under which warrant he is now imprisoned in the
Albany jail, and which warrant is returned to the court as the sole cause and
ground of imprisonment.

Preliminary to the statement of the question which this proceeding presents,
it is proper to observe that, in support of the legality of the imprisonment of
McDonald, it is not urged that either the senate or the legislature had any
*judicial* control over the incumbent of the office of commissioner of public
works of the city of New York.   Neither could punish him for crime nor
remove him for cause.   It could, however, initiate *legislation* concerning
the office, and thus, with the concurrent action of the assembly and the
approval of the governor, remedy any deficiencies in the statutes regulat-
ing the office, and by force of legal enactment provide for the removal

ing for contempts was inherent in every assembly that possesses a supreme legislative power. It is shown in these cases, and the doctrine is again confirmed in *Kilbourn* v. *Thompson* (103 U. S., 168), that, so far as this power of punishing for contempt belonged to the house of commons, it existed, not because that was a representative body with legislative functions, but because it was a part of the high court of parliament, a judicial body, the highest court of the realm, which had always possessed this power by ancient usage.

of the commissioner and for the selection of another individual to fill his place. It was strongly urged upon the argument in behalf of McDonald that the resolution of the senate does not contemplate any legislative action whatever, but only and solely an investigation as to the guilt of the commissioner of the charges which are recited in the resolution. The adoption of this view, however, as it imputes to the senate an assumption of power, is forbidden by the respect for that high and dignified body which should be cherished and observed by every judge. It will be assumed, therefore, that the inquiry which the resolution authorized was to be conducted for a legitimate and proper purpose, and that when the senate directed its committee " to report the result of such investigation, and its *recommendations* concerning the same," it intended thereby that such committee should report what legislation was, in its judgment, required to remedy evils or abuses, if any such were found.

From this narrative of fact it is evident that the question submitted is not, can the legislature, or either branch thereof, in execution and discharge of *judicial* functions (and there are some of that character expressly conferred by the Constitution of the State, such as, " each house shall * · * * be the judge of the elections, returns and qualifications of its own members," of the assembly to impeach, of the senate to remove from office, upon the recommendation of the governor, etc.), punish for contempt ? Nor is it, can either house in aid of legislation examine witnesses on oath, a right though most seriously questioned in a recent case by the Supreme Court of the United States. (*Kilbourn* v. *Thompson*, 103 U. S., 168–189.) But it is this, can either one of the two houses comprising the legislature of the State, through the authority which it undertakes to confer upon a committee, and by the agency of such committee, obtain and compel the testimony of individuals, supposed to be needed for the purpose of legislation, and on the refusal of any individual to attend as a witness and to give evidence, *punish* him for the alleged *offense* or *crime* of so refusing?

The question is certainly a grave one, and one which has never before in this State been so directly and flatly presented to a court for adjudication as now. It involves a careful study of the effect of the lodgment of the executive, legislative and judicial powers of the State in distinct and different departments, and the restraints thereby imposed upon legislative power, the inherent or inherited prerogatives of the legislature, or of either house thereof, and the necessary limitations upon all power under a republican system of government. The dis-

This view is again stated in *Speaker* v. *Glass* (Law Rep., 3; Privy Council Cases, 560). In that case parliament had expressly given to a colonial legislature the right to define its privileges, etc., provided they did not exceed those of the house of commons. The colonial legislature, under that authority, had defined its privileges, etc., to be the same with those of the house of commons. It was held, therefore, that, by this act of parliament, there had been given to that colonial legislature the same power of punishing for contempt as is possessed by the house of commons. Thus the case

---

cussion and consideration should be conducted with a sincere respect for that body in which, together with the assembly, by the Constitution of the State, it is declared, "the legislative power of this State shall be vested," and with an honest desire to preserve to it all its rights and privileges, but yet with a determination also to preserve to each great department of the government of the State the power lodged by the Constitution therein, the preservation of which to each is vital to the liberties and rights of the people of this commonwealth.

With the spirit just indicated, the examination of the question is approached, and in the forefront of inquiry is another query to be answered, upon the true solution of which the correct answer to the other must largely depend, and it is this: Was the power which the senate exercised over McDonald *judicial* or *legislative* in its character ?

In answering this question it is necessary to bear in mind not only the fact of the imprisonment of McDonald, but also the *language* of the order or resolution which commanded such imprisonment, to the end that the true nature and character of the power assumed may appear. The resolution recites that he had "been *declared* to be *guilty* of a contempt of the senate," and was " *convicted* thereof." It then states the particular contempt of which he was " *declared * * * guilty*," and of which he had been " *convicted*," and then proceeds to announce the *punishment* of imprisonment, as hereinbefore stated, and which is preceded by the words " is hereby *sentenced*." The language of the president of the senate in communicating to McDonald the determination of that body is also equally significant as to the character of the power it claimed to exercise. He said, after stating the offense of which McDonald had been adjudged guilty: " It becomes my duty to communicate to you, at this time, the *judgment* or *punishment* the senate has seen fit to impose upon you for the *offense* which you have committed." This declaration is followed by an enunciation of " the judgment or sentence " imposed by the senate.

From the foregoing statements of facts it is apparent that the senate summoned McDonald to answer for an *offense ;* that after a hearing or trial, upon which he was represented by counsel, it declared him " to be guilty " and " convicted " him " thereof," and then " sentenced " him to " the judgment or punishment " of imprisonment in the county jail of Albany county, where he is now detained, and where he must continue, unless relieved by this proceeding, " until the final adjournment of the present legislature, unless sooner discharged by

recognizes the law that, unless by the express enactment of parliament, a colonial legislature had no power of punishing for contempt. That question should be deemed settled.

Then the inquiry is presented, did parliament or the English government ever grant to the colonial legislature of New York the privileges of parliament, or this one of those privileges now under consideration? We find no such grant. The struggle was rather to withhold than to give power. We cannot do better than to quote from the very able and learned opinion of Mr. Justice WESTBROOK in

order of the senate." It needs no elaborate argument to prove that this was the exercise of *judicial* and not of *legislative* power. This conclusion follows irresistibly from the conceded truth that while it is the prerogative of the legislature, as a general rule, only to enact laws, and thus to declare what acts shall be deemed criminal, subject, however, to the restraints of the fundamental law, it is also, as a general rule, the prerogative of courts alone to interpret the laws, and to apply and enforce their remedies, either as between individuals or as between the State and parties subject thereto. There is, however, no occasion for abstract reasoning upon this point, as in the recent case of *Kilbourn* v. *Thompson* (103 U. S., 168–193), precisely the power which the senate has exercised, of general inquiry by a committee and the punishment as for a contempt of a person refusing to testify, was held to be "judicial and not legislative." (See, also, *Kielley* v. *Carson*, 4 Moore's P. C., 62, 80, 89; *Fenton* v. *Hampton*, 11 id., 347–352, etc.; *Doyle* v. *Falcomer*, 1 L. R., P. C., 328, in which, on page 350, it is distinctly asserted "that a power to punish for contempt is a judicial power.")

As then, the power which has been exercised over McDonald was judicial, which, as a rule, must be exercised by courts alone, in which that general power is lodged by the Constitution of the State, and as the senate had no judicial authority over the official whose conduct they were investigating when the alleged contempt was committed, and as the Constitution of the State expressly vests only *legislative* power in the senate and assembly, it is a most important question to be determined, as personal liberty is involved, when and how, and by virtue of what, did the senate acquire the *judicial* power, which alone can sentence the citizen to imprisonment in a common jail. It is true that there are statutory enactments in this State (1 Edm. R. S., 153, § 13, sub. 4) which undertake to confer upon "each house * * * the power to punish as a contempt, and by imprisonment, a breach of its privileges, or of the privileges of its members," in certain specified cases, among which are, "that of refusing to attend, or be examined as a witness, either before the house or a committee, or before any person authorized by the house, or by a committee, to take testimony in legislative proceedings." It is also true that this enactment can have force by limiting its provisions to those cases in which, by the Constitution of the State, either house has judicial powers (some of which have been previously mentioned), but it cannot be denied that relying upon the case of *Anderson* v. *Dunn*

this case upon this point: "No such bestowal of authority can be found in the charter issued by Charles I to his brother James, Duke of York, in 1669, nor in any act of parliament. It is unnecessary to detail the mode and manner of the government of New York while under English rule. It is enough to state that, instead of the absolute power of parliament being conferred upon the colonial legislature, or upon the people themselves, its laws were made subject to royal approval; and even the charter of liberties, pased on the 17th day of October, 1683, by the assembly, was vetoed by James (the same

(6 Wheat., 204), and which they refer to in their notes (3 R. S. [2d ed], 456), the revisers of our statutes supposed that the power to punish for contempts existed in both branches of the legislature. The authority relied upon, however, which does hold that either house of congress has, by virtue of its *legislative* power, *general* authority to punish for contempt, is *distinctly* overruled in the more recent case by the same tribunal (the Supreme Court of the United States), in *Kilbourn* v. *Thompson* (103 U. S., 168). Of *Anderson* v. *Dunn*, Judge MILLER, in giving the opinion of the court in the latter case, says: "It was decided as a case of the first impression in this court, and undoubtedly under pressure of the strong rulings of the English courts in favor of the privileges of the two houses of parliament. Such is not the doctrine, however, of the English courts to-day." The learned judge then refers to the English cases (103 U. S., 198, 199, 200), and concludes with the distinct repudiation of the extreme view of the power of either house of Congress, affirmed in *Anderson* v. *Dunn*. Notwithstanding, then, the existence of a positive legislative enactment justifying the power exercised in the case of McDonald, and notwithstanding the very eminent source from which it emanated, the revisers of our statutes, who were misled by the opinion of our highest federal tribunal, since overruled by the same supreme authority, it is still proper to ask how could the legislature confer upon itself, or upon either branch thereof, judicial power for the purposes of general legislation? Or to put the question more fully and accurately, it being conceded that the alleged contempt for which McDonald is imprisoned was committed, if at all, not in the course of a *judicial* inquiry which the senate, by the Constitution, was authorized to make, but in the course of a *legislative* inquiry, instituted with a view to possible *legislation*, how could a mere statute confer upon it the power which it has exercised? We are thus brought (as it is cited to uphold McDonald's imprisonment) to the discussion of the constitutionality of a statute of the State, an inquiry certainly of the gravest character, but one which courts must consider and decide, when arising in the due course of a judicial proceeding.

It cannot be denied that the law-making power of the State is more general, and reaches a class of subjects upon which the Congress of the United States cannot legislate; and as the grant of power to the legislature to legislate is general, it is for those who question the constitutionality of a statute to show that it is forbidden. (*People* v. *Draper*, 15 N. Y., 532, 543.) But while all this is

Duke of York) when he became king in 1686, and the act of 1691 shared the same fate. (Bancroft's Hist. U. S., vol. 2, p. 412; vol. 3, p. 56; Id., p. 101; 2 R. L., 1813, note on page 6 of appendix." See, also, introduction to New York Civil List, 1883, page 69, etc.)

In that charter of liberties, the only power claimed in this respect is that the representatives shall be the judges of the qualifications of their own members, and may purge their house as they see occasion.

But without going over the history of colonial authority, it is

true, it is also true that there are "positive restraints upon the legislative power contained in the Constitution," and that, as was further well said by DENIO, C. J., in the case just cited (page 544) in regard to that instrument: "Every positive direction contains an implication against anything contrary to it, or which would frustrate or disappoint the purpose of that provision. The frame of the government; the grant of legislative power itself; the organization of the executive authority; the erection of the principal courts of justice, create implied limitations upon the law-making authority as strong as though a negative was expressed in each instance." To this must be added the further thought that the jurisdiction of Congress to legislate, when exercised over the subject-matters confided to its care, is as supreme as that of the legislature of the State over those of which it has cognizance, and that, therefore, authority or right, which exists *as an incident of or as ancillary* to the simple power of legislation, must be possessed in an equal degree by both, for to each, subject, of course, to certain fundamental restraints, has been confided the authority which the people (of the several States in the one instance, and of one State in the other) had to legislate upon the subjects committed to each. The Constitution of this State, too, fails to confer upon its legislature, as the Constitution of the United States does upon its Congress, the express power to punish the citizen, and both declare "no person shall be *   *   * deprived of life, liberty or property without due process of law." These considerations make the case of *Kilbourn* v. *Thompson* (103 U. S., 168) applicable to the present, and the conclusion therein drawn from the distribution of the executive, legislative and judicial functions into different departments controlling on the point now being considered.

Conceding, then, that the power which has been exercised by the senate is a judicial one, that it was exercised in the pursuit of an inquiry which was legislative and not judicial in its character, that by the Constitution of the State its judicial power is committed to courts which are therein recognized, and to such other courts as the legislature are thereby authorized to establish, and that such deposit of general judicial power elsewhere than in the legislature is a prohibition against the conferring of such power upon itself, it is impossible to see how the provisions of the Revised Statutes, before quoted and upon which action has been based, can constitutionally confer upon the senate of this state the power which has been assumed. It is not designed

enough to say that the counsel for the respondent has cited us to no grant from the English parliament or from the crown, which conferred upon the colonial legislature the privileges of parliament, and unless these privileges were expressly given, the power to legislate, as has been shown, carried with it no power to punish for contempt. We are brought to the belief that the exercise of that power, though submitted to by the sufferers, and even though supported by colonial courts, was in violation of the law of England as above set forth. Some of the instances cited by counsel would be plainly illegal at this day.

by this to assert that the statutes in question are wholly void. They may have full application by limiting them to cases in which either house may act *judicially*, but upon reason and authority they must be held impotent to confer a general power to commit and punish as a contempt the refusal of an individual to give evidence, when such testimony is required solely for the purpose of *legislation*.

Not only, however, is the statute under consideration to be held inoperative in its application to the present case, for the reason that the power exercised thereunder is a judicial one, and cannot be lodged by the legislature elsewhere than where the Constitution has placed it, but also because it violates the express provision of that instrument declaring (art. 1, sec. 6): "No person shall be * * * deprived of life, *liberty* or property without due process of law."

In *Taylor* v. *Porter* (4 Hill, 147), Judge BRONSON, in speaking of this clause, said: "The words 'due process of law' in this place cannot mean less than a *prosecution or suit* instituted and conducted according to the prescribed forms and solemnities *for ascertaing guilt* or determining the title to property."

In *Kilbourn* v. *Thompson* (103 U. S.,168, 182), the Supreme Court of the United States, per MILLER, J., said: "Of course, neither branch of congress, when acting separately, can lawfully exercise more power than is conferred by the Constitution on the whole body, except in the few instances where authority is conferred on either house separately, as in the case of impeachments. No general power of inflicting punishment by the Congress of the United States is found in that instrument. *It contains, in the provision that no 'person shall be deprived of life, liberty or property without due process of law,' the strongest implication against punishment by order of the legislative body.* It has been repeatedly decided by this court and by others of the highest authority, that this means *a trial* in which the rights of the party shall be decided by a *tribunal* appointed by law, which *tribunal* is to be governed by rules of law previously established."

In holding that this provision of our State Constitution is applicable to the case under consideration, the force of certain decisions of our Court of Appeals (*Happy* v. *Mosher*, 48 N. Y., 313; *People ex rel. Witherbee* v. *Supervisors*, 70 id., 228), holding that due process of law "need not be a legal proceeding according to the course of the common law," has not been overlooked. While the cases referred to were undoubtedly correctly decided, it can hardly be supposed that the most ardent

It is, however, urged by the counsel for the respondent that the thirty-fifth section of the first Constitution of the State, that of 1778, declared that such parts of the common law as formed the law of the colony should continue; and the counsel urges that this privilege of parliament was a part of the common law, and hence that it was continued in force. Now it is at least doubtful whether the phrase common law, there used, included the privileges of parliament. The fundamental idea of common law is that it was common to all the subjects of the realm, while privileges of parlia-

---

advocate of plenary power in the legislature would attempt to sustain the constitutionality of a statute which directed a committee of either house to inquire into a controversy between individuals, and upon the report of such committee authorize either house, or the legislature itself, to decide such controversy. Nor would a law authorizing an inquiry by means of a legislative committee as to the commission of crime, and its punishment by the legislature, or either house thereof, upon the report of its committee, be deemed valid. Such attempted legislation in either case would be void, not only for the reason that it undertook to transfer judicial power from the courts, where the Constitution places it, but also because it violates the provision of the Constitution forbidding the deprivation of life, liberty or property without due process of law. In *Happy* v. *Mosher*, before cited, Judge EARL, while holding that the proceeding which takes property need not be one according to the course of the common law, distinctly says: "An approved definition of due process of law is, '*law in its regular course of administration, through courts of justice*' (2 Kent's Com., 13)."

As McDonald is confessedly deprived of his liberty, not according to "law in its regular course of administration through courts of justice," the legality of such imprisonment must be upheld by some other argument than one founded upon the statute which, as is alleged, confers it. If the power exercised is a judicial one (and that it is, is too clear to be debatable), then the attempt to confer it by law upon the legislature, or either house thereof, in a case over which it has no judicial power, must fail for the reasons given, unless also it is one inherent in a legislative body, as in courts, as the revisers seemed to suppose, when they reported these statutory provisions. Is it so inherent, is the next question to be considered.

In the discussion of this question it must be conceded that there are not wanting cases, nor opinions of elementary writers, holding that the power to punish for contempt is one inherent in every legislative body. (Cooley on Const. Lim., 134; 1 Kent, 236; 1 Story on the Const. [4th ed.], sec. 847). Such decisions and opinions, however, are founded upon the usage of the English parliament, the case of *Burdett* v. *Abbot* (14 East, 1–131), with the earlier decisions of the English courts, and the case of *Anderson* v. *Dunn* (6 Wheaton, 204). In the quite recent case, however of *Kilbourn* v. *Thompson* (103 U. S., 168), which follows the later English cases, overruling in that particular *Burdett* v. *Abbott* and the older decisions, the Supreme Court of the United States, in an exhaustive opinion by

ment, though well established, were exceptional rights. But whoever this may be, we have seen, from the cases cited, that the doctrine of the common law (if it be properly so called) was not that every legislative body possessed the power of punishing for contempt, in case of refusal to answer questions, but that such power belonged to courts, and that it had come to the houses of parliament as parts of the high court of the realm. If, therefore, the Constitution of 1778 continued the law on this point as part of the common law, it gave thereby no authority to punish for such

---

MILLER, J., has repudiated the conclusions announced in *Anderson* v. *Dunn*, and held that "an examination of the history of the English parliament and the decisions of the English courts, shows that the power of the house of commons, under the laws and customs of parliament to punish for contempt, rests upon principles peculiar to it, and not upon any general rule applicable to all legislative bodies. The parliament of England, before its separation into two bodies, since known as the house of lords and the house of commons, was a high court of judicature, the highest in the realm, possessed of the general power incident to such a court of punishing for contempt. On its separation the power remained with each body, because each was considered a court of judicature and exercised the functions of such a court."

It was argued, however, that the question in *Kilbourn* v. *Thompson* related to the power of a single house of congress, and that the question of the power of a State legislature was not before the court. This is true, but the point, what legislative power is inherent in a legislative body *as such,* was before the court, and the existence of the power, as a legislative one to punish for contempt, was denied. Neither, as has been before partially argued, is there such a difference between the legislature of a State and Congress as to make that decision inapplicable to the present case. Certainly Congress is a legislative body as well as a State legislature. If the right to punish for contempt exists by force of the fact that power to legislate is conferred, then it must exist in both. That the field of legislation varies cannot change the prerogative which follows the simple power to legislate, and therefore the conclusion which the court, in *Kilbourn* v. *Thompson,* drew from the fact that the judicial powers of the two houses of the English parliament were not "applicable to *all* legislative bodies," is conclusive against the existence of the power in a State legislature simply, and only because it has law-making power.

The case of *Kilbourn* v. *Thompson,* which has been so often referred to in the course of this opinion, is well worthy of a careful study, not only because it is the judgment of the highest court in the land, but also because the learned and exhaustive opinion of Mr. Justice MILLER conclusively shows that past precedents of the Congress of the United States and of the legislatures of the several States in legislative inquiries are not to be followed. They all undoubtedly had their origin in the practice of the English parliament, which the case of *Anderson* v. *Dunn* (6 Wheaton, 204), held to be applicable to both houses of congress

contempts to the assembly or senate, to which bodies was given simply legislative power. (Sec. 2, Const. 1778.) For the legislature of the State was not parliament, and was not a court.

There is another section of that Constitution, the ninth, which declares that the assembly (not the senate) shall enjoy the same privileges as the assemblies of the colony of New York of right formerly did. We have already seen, by the decisions of the English courts, that the colonial assemblies could not have enjoyed of right the privileges of committing for contempt in refusing to

The resolution under which the inquiry of the committee of the house of representatives in the Kilbourn case was conducted, recited that the United States was a creditor of the bankrupt firm of Jay Cooke & Co., and became such "from the improvident deposits made by the secretary of the navy of the United States, with the London branch of said house of Jay Cooke & Co., of the public moneys;" that the house of Jay Cooke & Co. were largely interested in a real estate pool in the city of Washington, of their interest in which a settlement, disastrous to their estate and to its creditors, had been made by their trustee; and that, therefore, the affairs of such pool and the matters of such settlement should be inquired into by a special committee of the house, to be appointed by its speaker, "with power to send for persons and papers and *report* to this house." Of such a resolution, as it involved an inquiry into a transaction in which the general government, as well as private individuals, was interested, it might well have been said that under it legislation was contemplated to prevent in the future "improvident deposits" by an official of the United States with an individual banking house, and to prevent fraudulent settlements thereafter by trustees of the estates of adjudged bankrupts, and that, therefore, the inquiry was within the power of the house; and yet, after Kilbourn had declined to answer questions propounded by the committee touching the pool it was required to investigate, and had refused to produce its records, and for such refusal the house had adjudged him to be in contempt, and had imprisoned him therefor, in an action brought for the imprisonment the court held that the inquiry was beyond the jurisdiction of the house and the imprisonment illegal and contrary to law. Can that case be distinguished from the present? It is, undoubtedly, very similar. The argument founded upon the necessity of an investigation to formulate legislation is as forcible in the one case as in the other, and if in the one case such argument was not sufficiently potent to justify the imprisonment, it is not seen why it should be in the other. True it is that the decision referred to was directly predicated upon the power of congress, and not upon that of a State legislature, but of the subject-matter of the inquiry the house of representatives had as full and complete jurisdiction in the matter of Kilbourn as the senate of this state had in that of McDonald. In both cases the intent to legislate was evinced, if there was any such intent in either, by the direction to the committee "to report;" in both the private affairs of the citizen were sought to be discovered; and until now the right of investigation by congress and the state legisla-

answer, unless that privilege had been granted expressly by the English government, and that no such grant is shown.

The Constitution of 1821 omits any such clause and merely provides that each house shall be the judge of the qualifications of its own members. The same is true of the Constitution of 1846. Thus the somewhat indefinite grant of power, given by reference to the powers of the assemblies of the colony, is taken away. The comment of the revisers of the statutes (Edmond's ed., vol. 5, p. 517) is of no weight, inasmuch as they

ture has been placed, both by elementary writers and in judicial opinions, upon a common ground, as an incident to the law-making power. The most exalted tribunal of the land having deliberately held that such power as has been assumed by the senate in the present case is not inherent in a legislative body (this is believed to be the logical sequence from the decision in the Kilbourn case), it is difficult to see how the imprisonment of McDonald can be sustained either on authority or reason.

If the decision in *Kilbourn* v. *Thompson* has not foreclosed discussion of the question under consideration, it may be well to further consider the argument generally pressed to sustain the power of a legislative body to punish as a contempt the refusal of a witness to answer questions in aid of legislation, founded upon its alleged necessity. The argument, in brief, is this: The power is a necessary one to enable a legislative body to enact laws, and because necessary, though unconferred, it exists. The force of the old maxim, " *Quando lex aliquid concedit, concedere videtur et illud, sine quo res ipsa esse non potest,*" is conceded as a general rule, but it would be difficult to prove that such a power is *indispensable* in the enactment of laws, and that legislators can only intelligently legislate in regard to crime and official delinquencies when they have *precise* information as to the crimes committed by particular individuals, and the delinquencies of particular officials. The truth is no such *exact* accuracy of knowledge has ever been acquired, either through investigation by examination of witnesses or without it, and the existence of our state government to-day, and our body of wise and wholesome statutes disprove the theory upon which the argument rests. It is not supposed in the present case that there was any intention impertinently to pry into the private affairs of a citizen, nor is there discoverable in the examination of McDonald any attempt to extort evidence which was not legitimate to the inquiry, provided the inquiry itself was legitimate and authorized by law. If the commissioner of public works of the city of New York had committed frauds, or if it was supposed he had, the machinery of the law, controlled by courts, was adequate to investigation and punishment. If the proper safeguards of integrity of official conduct in such commissioner were not embodied in the law creating the office, an examination of those statutes would disclose the opportunities for official peculation, and reflection would suggest proper amendment. The truth is, that if the " *Inquisitorial Power* " (this is the name given to it by the counsel for the senate) exists in a

were not the authors of the Constitution of 1821, and as they base their opinion upon *Anderson* v. *Dunn* (6 Wheat., 204), which has been overruled by *Kilbourn* v. *Thompson* (*ut supra*). Hence we may conclude that the right of the senate "to punish a citizen for contempt of its authority, or a breach of its privileges, can derive no support from the precedents and practices of the two houses of the English parliament, nor from the adjudged cases in which the English courts have upheld these privileges." (*Kilbourn* v. *Thompson, ut supra*.) Although that decision was made in a case

branch of the State legislature, the citizen can have no secret, all the details of his private business, the condition of his property and estate, any immoral conduct, any short-coming in thought, word or deed can be laid bare under the torture of imprisonment. Of course, good sense and honor will generally prevent such an abuse of power, but the statement of the ultimate conclusion is necessary before the concession is made of the existence of an unconferred power in a republican State capable of such results. If such a power is inherent in the legislative department because its existence is necessary, why does it not also inherently reside in the executive? The governor may, when called upon to act officially, and especially when making suggestions as to legislation, oftentimes need exact information. Why should he not enjoy the same prerogative under the plea of necessity? The answer to the argument in both cases is, that, under republican governments the liberty of the citizen is secure, and the power which interferes with it must be conferred by the fundamental law. Extraordinary parliamentary prerogatives and privileges, by which the secrets of the citizen may be extorted and his liberties taken away, existing in a country where a parliament is supreme and gives to the people whatever rights they possess, cannot exist in a country, the government of which rests upon a precisely opposite theory, that the people confer all power, and that executives, legislatures and courts take only such authority as the people bestow. It was well said by BRONSON, J., in *Taylor* v. *Porter* (4 Hill, 140–144): "Under our form of government the legislature is not supreme. It is only one of the organs of that absolute sovereignty which resides in the whole body of the people. Like other departments of the government, it can only exercise such powers as have been delegated to it; and when it steps beyond that boundary its acts, like those of the most humble magistrate in the State who transcends his jurisdiction, are utterly void." To the argument, then, founded on necessity, the answer is clear. Its possession may be convenient, but is not indispensable; its capacity for abuse is enormous; it deals with the liberty of the citizen upon the theory of existing parliamentary privileges, which have never been conferred, and because unconferred, cannot be exercised under a government republican in form, which, to be such in fact as well as in name, cannot commit persons within its jurisdiction to an "inquisitorial power," uncontrolled by law, the only restraint being the discretion of the body exercising it.

The argument already made, to show that the power exercised by the senate

arising upon a commitment by the house of representatives, still the argument and the language are appropriate to the present case. The fact that the federal government is one of limited extent does not, in any way, affect the argument as to the powers of its legislative bodies, in respect to the matters which belong to federal control. All legislative power on matters within the authority of the federal government is given to congress, just as in this State the legislative power is given to the senate and assembly. Whether that gift of power carries with it the privileges of the

---

in the case of McDonald is not one inherent in a legislative body, hardly needs the support of adjudged cases in addition to that of *Kilbourn* v. *Thompson,* but the following, with the single exception of one in Canada, by the privy council of England, abundantly sustain it: *Kielley* v. *Carson* (4 Moore's P. C., 63); *Fenton* v. *Hampton* (11 Moore's P. C., 349–366); *Doyle* v. *Falconer* (1 L. R., P. C. 328), and *Landers* v. *Woodworth* (2 Canada Sup. Ct. R., 158). If it is possible to settle a legal problem by weight of judicial character and learning, then this must be deemed settled, for looking at the learning of the judges who have rendered these decisions, especially that of *Kielley* v. *Carson,* it is true, as Judge MILLER asserts in the Kilbourn case, that because of their weight such decisions "should be received as conclusive."

It was further argued that, under section 17 of article 1 of our State Constitution, this power in question is conferred, because it adopts the common law of England and makes it a part of ours. A reference to that clause of the Constitution will show that the whole body of the common law of England was not thereby introduced into this State, but only "*such parts* of the common law, and of the acts of the legislature of the colony of New York, *as together did form the law of the colony* on the nineteenth day of April, one thousand seven hundred and seventy-five * * * shall be and continue the law of this State." The truth is, that the powers of the English parliament were not dependent upon the common law at all (see cases above cited), but upon the *lex et consuetudo parliamenti;* and as early as 1604 the parliament called itself (1 Hallam's Con. His., 254–5), "the high court of parliament," and then added, "whose power being above the law *is not founded on the common law,* but have their rights and privileges peculiar to themselves." It will be observed that the Constitution adopts only "such parts of the *common law,* and of the acts of the legislature of the colony of New York, as together did form the law of the colony" on April 19, 1775, and no part of the *parliamentary* law. It is necessary, therefore, to sustain the position taken by the counsel for the senate, to prove that the power claimed was either part of the *common law* of the colony, or was contained in an *act* of its legislature. As it was not a part of the common law of England, it is difficult to see how it could become a part of the common law of the colony; and as no act of the colony ever conferred it, it is equally difficult to see how the constitutional provision referred to aids the position assumed. The ninth article of the first Constitution of the State, adopted in

English parliament, is practically the same question in each case
when it is shown that those privileges belonged to parliament as a
court, and not, therefore, to every legislative body.

Another point is to be noticed. The question before us does
not touch, in any way, the power of the senate, or assembly, to
keep order in its own rooms, to judge of the qualifications of its
members and to expel them for improper conduct. To say that
they may do this is but to say that they have the common power
of a peaceable assemblage to ˊkeep order and expel disorderly

---

1777 (7th ed. R. S., 39), did provide ˮthat the *assembly* * * * shall choose
their own speaker, be judges of their own.members, *and enjoy the same privileges,*
and proceed in doing business in like manner as the assemblies of the colony of
New York of right formerly did;" but this clause gave no power to the *senate* and
was omitted in the subsequent constitutions. and the provision now reads as has
been set forth above. It has already been shown that the constitution, as it now
reads, does not give any color to the argument that it validates the power in
either branch of the legislature, but it may be well to show that the colonial
legislature had no such power in fact.

It clearly was never granted. No such bestowal of authority can be found in
the charter issued by Charles.I to his brother James, Duke of York, in 1664, nor
in any act of parliament. It is unnecessary to detail the mode and manner of
the government of the colony of New York while under English rule. It is
sufficient to state that instead of the absolute power of parliament being con-
ferred upon the colonial legislature, or upon the people themselves, its laws were
subject to royal approval, and even the charter of liberties, passed on the 17th
day of October, 1683, by the assembly of the colony, was vetoed by James (the
same Duke of York) when he became king in 1686, and the act of 1691 shared
the same fate under King William. (Bancroft's History of the United States, vol.
2, p. 414; vol. 3, p. 56; Id., p. 101; 2 R. L. of 1813, note on page 6 of appen-
dix.) "Its". [parliament's] "absolute power," Mr. Bancroft says (vol. 3, p. 101),
"was in general terms unquestioned in England, *even by American agents,* and
was by itself interpreted to extend over all the colonies, with no limitation but
its own pleasure. It was 'absolute and unaccountable.'" The same author
(page 108) further states: "The property, the personal freedom, the industry,
the chartered liberties, of the colonies were placed in the good will and under
the absolute power of the English legislature." It is unnecessary to pursue the
investigation as to the grant of power. It certainly was never made, and the
learned counsel who have argued in favor of the continuance of McDonald's
imprisonment have failed to point out when and by ˮhat it was bestowed.

Though the records of the past do not disclose the conferring of the authority
claimed to have existed in the colonial legislatures, it is, nevertheless, insisted
that.it was *inherited.* The practice and dealing of the English crown and par-
liament with the colony, already referred to, are as conclusive against the
existence of the power by *inheritance,* as by grant. If, however, it be clearly

persons.  That power is not a question here.  (*Hiss* v. *Bartlett*, 3
Gray, 468; *Cooley Const. Lim.*, 133; *Bradlaugh* v. *Gosett*, Law
Rep., 12 Queen B. D. 271.)

It has been seen, in the cases above cited, that, while denying
that a mere legislative assembly, as such, has power to punish for
contempt in refusing to answer questions, the cases have admitted
that this power resides in courts.  The reason for this is that, while
legislation is the establishing of rules for the future, judicial action
is the deciding upon the past and awarding punishment or recom-

understood what power parliament had, the impossibility of the succession to
such authority, either by the legislature of a colony or that of a republican State,
will clearly appear.  Blackstone, in his commentaries (vol. 1, pp. 160, 161), says:
" The power and jurisdiction of parliament, says Sir Edward Coke, is so trans-
cendent and absolute that it cannot be confined, either for causes or
persons, within any bounds.  And of this high court he adds, it may
be truly said '*si antiquitatem spectes, est vetustissima ; si dignitatem, est
honoratissima ; si jurisdictionem, est capacissima.*'  It hath sovereign and
uncontrollable authority in the making, confirming, enlarging, restraining, abro-
gating, repealing, reviving and expounding of laws concerning matters of all
possible denominations, ecclesiastical or temporal, civil, military, maritime or
criminal; this being the place where that absolute despotic power, which must
in all governments reside somewhere, is intrusted by the constitution of these
kingdoms.  All mischiefs and grievances, operations and remedies, that
transcend the ordinary course of the laws, are within the reach of this extraordi-
nary tribunal.  It can regulate or new model the succession to the crown, as
was done in the reign of Henry VIII and William III.  It can alter the estab-
lished religion of the land, as was done in a variety of instances, in the reigns of
King Henry VIII and his three children.  It can change and create afresh even
the constitution of the kingdom and of parliaments themselves, as was done by
the act of union, and the several statutes for triennial and septennial elections.
It can, in short, do everything that is not naturally impossible, and, therefore,
some have not scrupled to call its power, by a figure rather too bold, the omnipo-
tence of parliament."  The same author (page 163) further observes: "For as
every court of justice hath laws and customs for its direction, some the civil
and canon, some the common law, others their own peculiar laws and customs,
so the high court of parliament hath also its own peculiar law, called the *lex et
consuetudo parliamenti ;* a law which, Sir Edward Coke observes, is '*ab omnibus
quærenda, a multis ignorata, a paucis cognita.*'"  Is it to be gravely argued that
such supreme power, such extraordinary prerogatives, passed by *inheritance* to
either a colonial or State legislature, both of which took only *conferred*, and not
*inherited* authority ?  If they did, then freedom found no asylum on American
soil, and the founders of States unconsciously brought with them a tyranny,
which, like their shadows, followed them across the Atlantic and descended,
as did the mantle of the prophet, upon the shoulders of the body they created in

pense to litigants. Therefore it is necessary that the litigants should be enabled to show to the court, by witnesses, the truth as to the past. Hence the power to punish a refusal to answer.

Here then we must notice that by the Constitution the legislature has certain judicial powers. Each branch is the judge of the qualifications of its own members. (Art. 3, § 10.) This power is judicial in character, though often partisan in fact. There is a power to remove certain judicial officers. (Art. 6, § 11.) There is a power of impeachment. (Art. 6, § 1.) These are judicial powers.

the vain hope that well defined and circumscribed power, and not omnipotence, had been by them bestowed. If it be urged that, by inheritance, legislatures took only a few of these parliamentary prerogatives, of which their right to summon all citizens before it or its committees, and to extract from their unwilling breasts all secrets by the power of imprisonment, was one, it is answered that heirs, in the absence of a testamentary disposition, take the ancestor's whole estate, and the argument, founded upon an alleged inheritance, must be abandoned because it proves too much. But if a partial inheritance is consistent with the argument based upon an alleged heirship, and it be urged that only such powers as were consistent with the changed order of things were taken, then it is insisted that this particular power, so potent for mischief, and aptly termed "*inquisitorial*," could not descend by inheritance to the legislature of either a colony or a republican State. It is inconsistent with the framework of both, and the conceded fact that both took only *conferred* power, and not any by *inheritance*, is a sufficient answer to the suggested argument.

Abstract reasoning, however, is again made unnecessary by the decisions of English courts. In the cases before cited (*Kielley* v. *Carson*, 4 Moore's P. C., 63; *Fenton* v. *Hampton*, 11 id., 347, 366; *Doyle* v. *Falconer*, 1 L. R., P. C., 328; also the Canada case, *Landers* v. *Woodworth*, 2 Can. Sup. Ct. Rep., 158), this very point now under consideration was expressly decided, and they hold distinctly that the legislatures of the colonies of England did not take the power of parliament to punish for contempt. They have so decided, after full and exhaustive argument, when presided over by judges whose names and character are world-wide famous, and such decisions, in every judicial forum, should arrest discussion and dispel doubt.

To the suggestion that the Constitution of the State adopted the statutes in force when it took effect (art. 1, § 17), and therefore validated those which assumed to give power to the legislature to punish for contempt, it is an answer to say that if unconstitutional they were not "*in force*," but were void, and were not embraced within the language of the Constitution; and to the further suggestion that the power which has been exercised over McDonald is one which has long been resorted to, it is sufficient to say that the existence of power, whenever claimed, can be resisted by questioning its bestowment, and that its use by congress for a term almost equally long did not prevent the judicial declaration in the Kilbourn matter, that his imprisonment was unlawful.

They imply a decision on past occurrences and a giving judgment accordingly. It may be, therefore, that in all actions of this kind, the senate and the assembly may rightfully enforce the same power of punishing for refusing to answer questions which is exercised by courts. These cases, therefore, we exclude from consideration. The relator was not examined in any such case.

Aside from these cases, the Constitution gives the senate and assembly only legislative power. Judicial power, on the other hand, is vested in the courts named in the Constitution and in such

It is believed that the various grounds upon which the legality of the imprisonment of McDonald was sought to be justified have now been examined, and the result of such examination is the conclusion that in the light of the recent decisions in England, that in *Kilbourn* v. *Thompson*, and of reason, it cannot be upheld. If McDonald had refused to answer questions in aid of an inquiry in which the senate was authorized to act *judicially*, then the power to commit would follow; and to guard against any misapprehension, the general statement should be made, when the legislature or either branch thereof is in the execution of *judicial* functions conferred by the Constitution, the power to commit for contempt cannot be doubted. When, however, the inquiry is *for legislative* purposes only, and such it was in the present instance, most careful examination and reflection leads the judge to whom this case has been submitted to more than doubt the legal existence of the power which has been exercised over McDonald. This, however, is his individual conclusion, supported, it is true, by the decision of *Kilbourn* v. *Thompson*, and those recently made by the privy council in England, but which, though of very high authority, have not yet been adopted in this State. The judicial utterances in cases determined in this State (though in none, with the single exception of *People* v. *Learned*, was the direct question involved), are against the conclusions herein stated. The contrary rule was affirmed in *Briggs* v. *Mackellar* (2 Abb P. R., 30), in *Wickelhausen* v. *Willett* (10 id., 164) and again in same case (*sub nom. Wilckens* v. *Willet*, 1 Keyes, 521, 525) in the Court of Appeals. In the last mentioned case was involved the legality of the arrest of an individual for neglecting to appear before a committee of the house of representatives of the Congress of the United States, as a witness " in a matter," as the stipulation under which it was submitted admitted, " then pending and under investigation by said house, *and within its jurisdiction* " It did not, and could not, therefore, decide that the power to punish for contempt existed, when the refusal to testify was made in the course of an examination in aid of general legislation; but the existence of such a power is stated both by Judge HOFFMAN in the Superior Court and Judge JOHNSON in the Court of Appeals, in the most unqualified language. Such utterances, however, were made long prior to the decision in *Kilbourn* v. *Thompson*, and if that had then been promulgated, they perhaps would never have been announced with the breadth which they now cover. Still they are in conformity with the *dicta* of other judges scattered through the reports and the opinions of various elementary writers, and, there-

inferior courts as may be created. And it is evident that the grant of judicial power to the courts is an implied prohibition of its assumption by the legislature, except as authorized by the Constitution. (*Leggett* v. *Hunter*, 19 N. Y., 463.) "All the powers intrusted to government, whether State or national, are divided into three grand departments, the executive, the legislative and the judicial. * * * It is also essential to the successful working of this system that the persons intrusted with power in any of these branches shall not be permitted to encroach upon the powers confided

fore, as the practice of this State has been in conformity with such opinions for many years, should not be disregarded by a single judge in judicial action, even though his views may be widely different from theirs.

The need of conservative action in this particular case is enforced not only by the opinions to which reference has been made, but also by one adjudged case, that of the *People* v. *Learned* (5 Hun, 626), in this judicial department. A commission had been created by joint resolution of the legislature (Laws of 1875, 823) " to investigate canal affairs," and by an act (chap. 91 of Laws of 1875) it was authorized "to compel the attendance of witnesses." One Henry D. Denison had refused to produce before such commission certain books and papers, and for such refusal had been committed to the common jail of Albany county. On *habeas corpus* Mr. Justice LEARNED had released him from imprisonment, which decision was reversed by the General Term of the Supreme Court, Judge JAMES writing the opinion and Judge BOARDMAN concurring. It is true that the authority of this case is very much weakened by the fact (vol. 16 of Albany Law Journal, 96) that when the case came before the Court of Appeals for review, the counsel, who had been successful at the General Term, " asked the court not to review it, and stipulated not to enforce the determination, either against the person or the property of Denison," and that thereupon the Court of Appeals refused to hear it, but, nevertheless, until reversed it must control this court as now organized. The opinion of Judge JAMES cites no adjudged cases, holding that the power which the canal commission exercised was legally conferred, nor is it sustained by any argument therein stated. The conclusion, however, that the decision of Mr. Justice LEARNED should be reversed, can only be justified upon the assumption that the legislature could confer judicial power upon the commission it created, by which alone it could make its inquiry effective. It needs no argument to demonstrate that, if such power could be conferred upon a commission charged with the mere duty of investigation, it could also be conferred upon a committee of either house of the legislature. If that decision is the law of this State, then the imprisonment of McDonald is abundantly justified, and certainly, until reversed, it is the law governing the *action*, if not the *opinion*, of every judge within the department where it was made, when sitting alone and holding a court inferior in dignity to that which announced it.

It is undoubtedly an argument of great force, that since the *dicta* contained in opinions and text books, to which allusion has been made, were written, the

to the others, but that each shall, by the law of its creation, be limited to the exercise of the power appropriate to its own department and no other." (*Kilbourn* v. *Thompson, ut supra.*)   It would hardly be claimed that the legislature could make itself, or one of its branches, an appellate tribunal from the court of appeals, or that it could authorize either of its branches to try a person indicted for murder, or to try a civil action.

It is further claimed, on the part of the respondent, that under 1 Revised Statutes, m. p. 154, section 13, subdivision 4, the senate was authorized to imprison the relator.   Now we must here notice that nothing is gained by calling the act for which a person may be imprisoned, according to that statute, a breach of privilege.   It has

Supreme Court of the United States and the Privy Council of England have over-ruled the earlier decisions upon which they rest.   This argument has also been carefully weighed, but the judge writing this opinion has been unable to reach the conclusion that it would be a wise exercise of power for him, when singly holding a court, to overturn the entire practice of the State.   Judges and courts must be conservative and not rash in action.   A decision of a single judge, contrary to the practice of years of his own State, contrary to an adjudged case in the tribunal which is his immediate superior, and contrary to the opinion of the higher branch of the legislature of such State, in which are many lawyers of eminent ability, would not command respect, and would only create alarm as an abuse of power.   The effect of the decision in *Kilbourn* v. *Thompson*, and those by the privy council in England upon the legislative practice of this State must be determined by a higher tribunal than the one which now deals with the present case.   If its decision shall be in conformity with the views expressed in this opinion, the relator will not be remediless; and if it shall be adverse to such views, then the conclusion reached — that Mr. McDonald must be remanded to the custody of the sheriff of Albany county, to be held by him under the senate's warrant of commitment — will not interfere with the exercise of a power which the body exercising it claims to possess, and which it supposes it is wielding for the best interests of the State.

In conclusion a word should be added upon a point made in behalf of McDonald, to the effect that the Penal Code has taken from the legislature all power to punish for contempt.   The argument is that, by section sixty-nine of such Code, if he unlawfully refused " to answer any material or proper question " asked by the senate's committée, he could be indicted for a misdemeanor, and as his offense was thus punishable according to the provisions of such Code it was to be punished thereunder " and not otherwise." (Sec. 719.)   This is specious but not sound.   The Penal Code prescribes and relates to the "*punishments*" to " be inflicted only upon a legal conviction in a *court* having jurisdiction " (sec. 9); and the Code of Criminal Procedure prescribes the manner of prosecuting and convicting criminals." (Sec. 8).   The object of section 719 was to declare when the old penalties attached

already been shown that privileges, as known in the English parliament, do not necessarily belong to these legislative bodies of senate and assembly. Whatever authority they have comes from the Constitution. If the Constitution, fairly construed, gives them authority to enact a law of this kind, then the law is valid; otherwise not. (*Taylor* v. *Porter*, 4 Hill, 140; *Powers* v. *Bergen*, 6 N. Y., 366.)

What, then, is the nature of the punishing for contempt in refusing to answer? It is clearly judicial. It includes the deciding upon a question of fact, viz., whether the alleged act has been committed; and upon a question of law, viz., whether the inquiry was material; and the further determination of the proper punishment

---

to crime, *on conviction after a prosecution in and before a competent court*, and when the new were applicable. After declaring that the provisions of the Code should have no retroactive effect, it explicitly states that "an offense committed or other act done, at any time *before* the day when this Code takes effect * * * must be punished according to * * * the provisions of law existing when it was done or committed;" while one "committed *after* the beginning of the day when this Code takes effect, must be punished according to the provisions of this Code, and not otherwise." A general statute, as a rule, does not repeal a special one, and therefore a general code of laws relating to the penalties which *courts* must impose on *convictions* for crime according to the usual mode of procedure do not repeal special provisions to punish summarily for contempt. The words "not otherwise" in such section simply forbid courts, in punishing criminals for offenses to which the penalties of the Code are applicable, to do so "otherwise" than as such Code provides. It is unnecessary to pursue this point further. A comparison of the various sections with each other, and the language of the whole of section 719, and not of a single paragraph read alone, makes the meaning clear. If all power of the legislature to punish summarily for contempt is repealed, then all which courts had has also vanished; and if the latter had been swept away, as there was no punishment by the court summarily for contempt, it was useless to declare, as has been by section 680, that an act "punishable as a contempt of court" was also "punishable as a crime." This recognizes that the provisions as to court contempts are not repealed by the Penal Code; and if those are not, then legislative contempts are not, for both are punishable under such Code as misdemeanors.

It remains only to be said that to a higher court than the present, the very grave questions involved in the present proceeding are committed, in the hope, however, that the views expressed in this opinion will, even though not adopted, aid in arriving at a sound and judicious conclusion thereon. If the labor and thought which have been given to the subject shall, in any way, assist the tribunal of review, he, who has given to it much of both, will be fully compensated.

to be inflicted. So the resolution of the senate shows, under which McDonald was committed. It recites that he has been "*declared guilty*" and "*convicted*," and it announces a *punishment*. The conclusion, then, is inevitable that the proceeding was judicial, involving a trial and a punishment for wrong-doing.

When courts punish a witness for refusing to answer, their act is one in aid of a judicial proceeding, viz., the litigation which is then pending. It is also itself a judicial act, a trial before the court then sitting, instead of, or it may be in addition to, a trial before some other court. It is done in aid of the interests of litigants, who have a right to know the facts which the witness refuses to disclose. It is for their sake that this right has always been exercised. And this should always be noticed; that it is always the right of the litigant which is enforced under the name of contempt of court.

If, then, this statute be valid, the legislature can confer upon itself judicial authority to try, convict and punish. We see no warrant for this in the Constitution. It might be that the legislature could authorize the governor, in matters committed to him, such, for instance, as the granting of pardons, to receive the testimony of witnesses. Would it be thought a lawful exercise of power to authorize the governor to punish for contempt a witness who should refuse to answer? Certain corporations are required to make on oath returns to certain State officers. Could these officers be vested with a power to punish, as for contempt, a refusal to make such returns?

We are not here called upon to say that the legislature cannot pass a valid law, requiring witnesses to testify before committees who are engaged in proper investigations and declaring a refusal to be a misdemeanor. The question here raised is as to the power of a branch of the legislature itself to punish for the violation of such a law. The statutes of every year are full of provisions requiring citizens to do some act. The refusal to do the act is usually a misdemeanor. Can the legislature, or a branch of it, try the offender? Certainly not. By what right, then, can the legislature assume judicial authority in this case rather than in any other?

But it may be urged that the right to summon a witness and to hear testimony necessarily includes a right to compel the giving of

testimony by imprisonment.  By no means.  Passing, for the present, the question as to the right of the legislature to take testimony for mere legislative purposes, we shall see that, even in courts, the right to punish a witness by imprisonment does not always exist; as, for instance, in justices' courts.  (Code Civ. Pro., § 2974.)  The contempts which a justice may punish as criminal are few; and the refusal to testify is not one of them.  (Sec. 2870.) The aggrieved party is left to his action for damages.  (Sec. 2979.) And the witness remains probably subject to punishment in a criminal court.  (Penal Code, § 143, sub. 6.)

And certainly if we were to consider the question not as one of law, but as one of wise protection to the witness, it would be best that his punishment for a refusal should be left to the courts.  In trials before courts there are opposite parties.  The witness appears for one or the other, and he is practically within the protection of the party for whom he appears.  If there be a doubt as to his obligation to answer some question, he is sure to be protected by the arguments of one side or the other.  And no decision is made until the matter has been fairly considered.  But in a case like the present it is very different.  The committee of the senate is investigating; searching for facts in any way and by any questions.  There is no impartial tribunal to decide whether the question is proper or not. The senate prosecutes the inquiry; the senate decides the question to be proper; the senate refuses to allow the witness counsel; and the senate sends him to jail.

We pass to consider some authorities which have been thought to bear on the question before us.  That of *Anderson* v. *Dunn* (6 Wheat., 204) is usually relied upon to sustain the inherent power of legislative bodies to punish for refusal to answer.  It is followed in *Wickelhausen* v. *Willett* (*ut supra*) and is the basis of the *dictum* in 1 Kent Commentaries, 236.  It is enough to say that it is overruled by *Kilbourn* v. *Thompson* (*ut supra*) and by *Kielley* v. *Carson* (*ut supra*).  The case of *Burnham* v. *Morrissey* (14 Gray, 226) rests upon an express provision in the Constitution of Massachusetts.  Furthermore, in the opinion, it is stated that the house of representatives "is the grand inquest for the commonwealth, and as such has power to inquire into the official conduct of all officers of the commonwealth, with a view to impeach-

ment." We have already said that the present case does not
belong to that part of the powers of the senate. Nor is the
senate, in any case, an impeaching body. (1 R. S., m. p. 155,
§ 15.) In *Whitcomb's case* (120 Mass., 118), it was held that the
legislature could not confer upon a body, not judicial, the power
to punish for contempt. In *People* v. *Learned* (12 Sup. Ct.
N. Y. [5 Hun], 626), the principal argument of the counsel in behalf
of the power to punish rested on the position that the body, to which
the power had been given, was a court. On the other hand, the
counsel for the prisoner, led by the decision in *Anderson* v. *Dunn*,
and the like, admitted, in argument, the existence in legislative bodies
of the power to punish for contempt in refusing to answer. On
these lines of argument, therefore, it is not strange that the opinion
in that case has not a word on the question here involved. That
case was taken to the Court of Appeals; and when it came on to be
argued, the attorney general stipulated not to enforce the warrant
of commitment; and against the protest of the prisoner's counsel, the
court refused to hear the argument. (16 Alb. L. J., 96.) This course
was the more noticeable, as there were, in fact, other witnesses than
Denison who had in like manner refused to answer.

But again it is urged that, assuming that there may be some cases
in which the senate might imprison for refusal to answer (as, for
instance, in the trial of charges against judicial officers), then the
senate is the sole judge of the proper exercise of its powers, and the
court cannot interfere. But the contrary was held in *Kilbourn* v.
*Thompson* (*ut supra*). In that case the court, passing the question
whether the house of representatives might not commit for refusing
to answer in a proper investigation, and admitting that the house
might commit for a refusal to answer in election cases and the like,
yet claimed for itself the right to examine whether, in the case then
in question, the power was lawfully exercised. And in the language
of the court in that case : "We cannot give our assent to the
principle that, by the mere act of asserting a person to be in
contempt, they (the senate) thereby establish their right to fine and
imprison him, beyond the power of any court or other tribunal to
inquire into the grounds on which the order was made." To the
same effect are some of the remarks in *Burnham* v. *Morrissey*
(*ut supra*).

It may, however, be said that section 2032, subdivision 3, Code Civil Procedure, required the court to remand the prisoner. In the case of commitment by courts the aggrieved party has his remedy by appeal or *certiorari*, as the case may be. Hence he should not be allowed to review by *habeas corpus*. There seems to be exceptions, even in these cases. (*People ex rel. Tweed* v. *Liscomb*, 60 N. Y., 559.) But in the present case there can be no review of the action of the senate by appeal or *certiorari*. It must then be the right of the aggrieved party to bring his case before the court. To hold that the legislature could commit for contempt and then could forbid all inquiry into the rightful exercise of the power, would be to take away the benefit of the writ of *habeas corpus*. (Const., art. 1, § 4.) Unless the question as to the lawfulness of McDonald's imprisonment can here be examined in every view, then the senate, when not acting as a court, may imprison a man, and there can be no judicial protection to him whatever. But whether the witness was bound to answer depends on legal principles, on which he is entitled to a judicial decision. (*Stockdale* v. *Hansard*, 9 Ad. & Ellis, 1.) It is the very basis of liberty that no person shall be imprisoned unless the right to imprison him has been, or may be, determined by the judiciary. (*People ex. rel. Lawrence* v. *Brady*, 56 N. Y., 182; *Taylor* v. *Porter*, 4 Hill, 140; Const., art. 1, § 1.) It must be for the courts to decide whether he is deprived of his rights "by the law of the land." Otherwise the legislature might pass a law to imprison a man, with or without cause, and he would be remediless.

And it may further be observed that section 2032, subdivision 3, Code Civil Procedure, refers, for the definition of criminal contempts, to section 8. And section 8 limits the power to punish such contempts to courts of record, and thus limits such contempts to acts done in contempt of such courts.

Probably the question as to the right of either branch of the legislature to make investigations is not necessarily before us. As long as witnesses are willing to answer questions, there seems to be nothing for the court to decide. Nor is it quite easy, when a question like the present does arise, to lay down a rule limiting the right of investigation. For the resolution of investigation, perhaps, need not express the ultimate object to be attained. And possibly

the legislature might be in search of information which would aid in legislation for the future.

In the case of *Kilbourn* v. *Thompson*, however, already cited, the court examined the resolution under which the investigation was carried on ; and remarked that it contained " no hint of any intention of final action by congress on the subject," and, continuing, they said : " Was it to be a fruitless investigation into the personal affairs of individuals ? If so, the house of representatives had no power or authority in the matter more than any other equal number of gentlemen interested for the government of their country."

The return to the writ of *habeas corpus* sets forth the warrant. This does not state the resolution of the senate, or the questions which McDonald refused to answer. A point may be made whether such a warrant is good. (*Matter of Quin*, 7 Abb. Dig., 402.) By way of traverse to the return, the petitioner has set out the proceedings. The resolution recites that grave charges of fraud and irregularities have been made by the public press and the Union League Club against Hubert O. Thompson, commissioner of public works of the city of New York; that in the opinion of many persons the charges have not been explained or refuted; that it is important to taxpayers that heads of public departments should be beyond reproach ; and it then directs a committee of the senate to investigate the department of public works in the city of New York. No further action is proposed by the resolution.

This department is not a state department. It is merely one of the branches of the city government of New York. Except on account of the magnitude of its work, there is no more reason that the senate should investigate this department, than that they should investigate the action of the highway commissioner of some town, charged with fraud and irregularities by the village newspaper and the frequenters of the village tavern. And it can be seen by this recital that this investigation was one appropriate for a grand jury. No legislation was proposed for the future. No redress could be given by the senate for the past. If frauds had been committed, " the case, being one of a judicial nature, for which the powers of the courts usually afford the only remedy, it may well be supposed that those powers were more appropriate and more efficient in aid of such relief than the powers which belong to a body whose

function is exclusively legislative." (*Kilbourn* v. *Thompson, ut supra.*) It has not been suggested, upon the argument, that any action could be taken by the senate which would redress these alleged frauds and irregularities. And it is by no means apparent that investigations under oath are needed, or useful in aid of legislation for the future.

In the view, however, which we have taken, that, except when acting as a court, neither branch of the legislature has power to punish, as for contempt, the wrong-doing, if it be such, of a witness in not answering, we do not consider it necessary to decide whether, if he should be brought before a court in a proper manner, McDonald could successfully claim that the investigation was unwarranted. And as McDonald was in the custody of the sheriff at the time of presenting this petition, we have no occasion to inquire as to the authority of the sergeant-at-arms to make an arrest of a private citizen. (4 Bl. Com., 293.)

We might leave the matter here. But other points have been argued which we will consider. We come then to the specific questions, for refusing to answer which the witness was punished. These are not pointed out in the proceedings before the senate. But an examination of the proceedings before the committee indicates that the following are the only questions which the witness refused to answer, when required:

Do you keep books of this coal business?

Do your carry on your coal business any differently, or upon any different system, from what you do your business with the city?

How much coal do you keep at your dock?

How much business do you do in the way of coal? I mean all the time.

Give me the name of somebody else besides Robert Gubbins that was breaking stone there for you?

Who are they (from whom you get chips) except the Tompkins Cove people?

So far as we can discover, these are the only questions which the witness refused finally to answer, after the committee had insisted on his answering. We must assume, therefore, that these are the "pertinent questions" referred to by the resolution of the senate.

As to the questions respecting the business of the witness, we

cannot see the least pertinency to the subject of investigation. There does not appear to be anything connecting the coal business with the alleged frauds and irregularities. The questions were impertinent, should not have been asked, and need not have been answered.

The question as to who was breaking stone for witness is liable to the same objection. The resolution of the senate did not permit an inquiry as to the persons employed by a witness, who was not himself an officer, or employe of the department.

Nor was the witness obliged to tell where he obtained the limestone chips. That was strictly his own business. No question was put tending to show that the chips belonged to the city, before the witness delivered them. And if not, it was immaterial where he obtained them.

Many questions had been previously asked which seem to have been even less material and less pertinent to the investigation than these. But the witness, being at that time unattended by counsel, answered them. Subsequently he procured counsel. His counsel was permitted to be present "as a matter of courtesy;" but upon his advising the witness not to answer certain questions, the committee refused any longer to recognize the right of the witness to have counsel, and thereupon the witness withdrew. Thus the committee appear to have been willing to have the counsel present so long as he gave no advice. The committee had their own counsel acting for them and conducting the examination. The course of the examination showed an intention to charge the witness himself as a party to the alleged frauds and irregularities.

The committee in the present case, after an executive session, formally ruled that "all questions must be answered that do not tend to criminate a witness; that the committee will judge as to whether the questions asked will criminate the witness or not." Thus the committee insisted that questions should be answered, although they were immaterial, and although they would tend to degrade the witness. (See *People* v. *Brown*, 72 N. Y., 571.) The committee and their counsel naturally desired to get all the testimony which they thought might be of any use to them. They would not be likely to reject questions put by their own counsel. And we see no reason why the committee should have excluded a

legal adviser of the witness, if he desired to have one present. It was unjust to the witness that he should be exposed to the unlimited examination of shrewd counsel without having anyone to advise and protect him.

No complaint was made of any improper conduct on the part of counsel. He was excluded simply because, in good faith, he endeavored to protect his client against an improper course of examination. The case may not strictly come under the Constitutional provision, article 1, section 6; because this proceeding was not a trial. But it seems to us a matter of common sense that a citizen, though he be a witness before a legislative committee, should have a right, in an orderly manner, to take advice of counsel as to matters which may seriously affect him or his business. This is not saying that the advice of counsel will protect him, should the court think the question was proper. It is only asserting the very common right of a citizen to take legal advice when he wishes. And the question was so decided in a similar case. (*Stewart* v. *Turner*, 3 Edw. Ch. R., 458.) There it was held that, on the examination of a witness before a master in chancery, the witness had a right, in the presence of the master, to consult his own counsel as to the propriety or duty of answering any question proposed to him.

We are therefore of the opinion : 1. That the questions put were immaterial and that the witness was not bound to answer them. 2. That the witness had a right to have the advice of counsel, in an orderly manner, and that, when this was refused, he was justified in withdrawing. 3. That, except when engaged in the judicial functions authorized by the. Constitution, neither branch of the legislature has any power to punish as for contempt for a refusal to answer a question. 4. That the order refusing to discharge McDonald should be reversed and that he should be discharged.

Present — LEARNED, P. J., BOCKES and BOARDMAN, JJ.

Order reversed, and relator discharged. .